UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,     )
                           )
       Plaintiff,        )  Case No. 19-MJ-6290-MPK
                           )
v.                           )
                           )
MARCIO COSTA A/K/A "MARCINO",    )
JOAO PEDRO MARQUES GUIMARES     )
GAMA A/K/A "BAHIANINHO",        )
                           )
                           )
       Defendants.       )
                           )

BEFORE THE HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

PROBABLE CAUSE HEARING

April 30, 2019

John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts  02210

Digitally recorded
Transcribed stenographically by:
Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Timothy E. Moran
 3    U.S. Attorney's Office
      One Courthouse Way, Suite 9200
 4    United States Courthouse
      Boston, MA 02210
 5    617-748-3100
      timothy.e.moran@usdoj.gov

 6

 7    On Behalf of the Defendant Marcio Costa:
      Scott Lauer
 8    Federal Public Defender Office
      District of Massachusetts
 9    51 Sleeper Street
      5th Floor
10    Boston, MA 02210
      617-223-8061
11    Scott_Lauer@fd.org

12    On Behalf of the Defendant Joao Pedro Marques Guimares Gama:
      Vivianne E. Jeruchim
13    Jeruchim & Davenport, LLP
      50 Congress Street
14    Suite 615
      Boston, MA 02109
15    617-720-6047
      jeruchim@jdlawyers.com

16

17    Interpreter:  Claudia Azoff

18

19

20

21

22

23

24

25
```

1

2                          INDEX

3    WITNESS                                          PAGE

4
     SEAN CONNOLLY
5
       Direct Examination By Mr. Moran                  6
6      Cross-Examination By Mr. Lauer                  25
       Cross-Examination By Ms. Jeruchim               33
7

8

9                     E X H I B I T S

10
     Exhibit No.                        Received
11

12      1                                  13

13      3A, 3B                             15

14      4A, 4B                             16

15      5, 5T                              21

16      6A, 6B                             23

17      7                                  24

18      8                                  24

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2    (Case called to order.)
 3            COURTROOM CLERK:  Counsel please identify themselves
 4    for the record.
 5            MR. MORAN:  Good morning, Your Honor.  Timothy Moran
 6    for the United States.
 7            THE COURT:  Good morning.
 8            MR. LAUER:  Good morning, Your Honor.  Scott Lauer on
 9    behalf of Marcio Costa.
10            THE COURT:  Good morning, sir.
11            MS. JERUCHIM:  Good morning, Your Honor.  Vivianne
12    Jeruchim on behalf of Joao Guimares Gama.
13            THE COURT:  Good morning.  Good morning, sir.  We now
14    need to swear in the interpreter.
15            (Interpreter duly sworn.)
16            COURTROOM CLERK:  Can you please state your full name
17    for the record.
18            INTERPRETER:  Good morning, Your Honor.  Claudia
19    Azoff.
20            THE COURT:  Good morning, Ms. Azoff.
21            Okay.  So we're here for detention and probable cause.
22    And I think -- Mr. Lauer, what's your position on detention?
23            MR. LAUER:  My client will be asking the court to
24    enter a voluntary order of detention without prejudice.
25            THE COURT:  And Ms. Jeruchim?
```

1          MS. JERUCHIM:  Likewise, Your Honor.

2          THE COURT:  Okay.  So Mr. Costa and Mr. Guimares, I'm

3    going to address both of you.  You are entitled to have a

4    detention hearing.

5          No problem.  What should we do?  Can you hear now?

6    Okay.  So can you hear?

7          Okay.  So you are entitled to have a detention hearing

8    within a certain period of time, a certain period of days.  And

9    what your lawyers are saying is that you don't wish to have the

10   detention hearing right away.  So you're not really waiving the

11   hearing.  You're just waiving the timing of the hearing.  So

12   you will not have a detention hearing today.  You will have a

13   probable cause hearing but not a detention hearing.

14         If you want to have a detention hearing in the future,

15   you can just tell your lawyer and we'll schedule it for you,

16   okay?  It's just that that's not happening today.  But you can

17   still have it if you want to.

18         Okay.  So Mr. Costa, do you understand that and is

19   that okay?

20         DEFENDANT COSTA:  Yes.

21         THE COURT:  Okay.  And how about you, Mr. Guimares; is

22   that okay?

23         DEFENDANT GUIMARES:  (Nonverbal response.)

24         THE COURT:  All right.  So I'm going to enter a

25   voluntary order of detention for both of you, and that's

1    without prejudice to your bringing it forward later if you want

2    to.

3            Okay.  So for probable cause, I think the government

4    has a witness.

5            MR. MORAN:  Yes, Your Honor.  The government would

6    call HSI Special Agent Sean Connolly, who is in the box.

7            SEAN CONNOLLY, Sworn

8            COURTROOM CLERK:  Can you please state your full name

9    and spell your last name for the record.

10           THE WITNESS:  My name is Sean Timothy Connolly,

11   C-o-n-n-o-l-l-y.

12           COURTROOM CLERK:  Thank you.

13   DIRECT EXAMINATION BY MR. MORAN:

14   Q.   Sir, how are you employed?

15   A.   I'm employed as a special agent for Homeland Security

16   Investigations.

17   Q.   And how long have you been with HSI?

18   A.   Over seven years.

19   Q.   Where are you assigned for HSI?

20   A.   I'm assigned to the transnational crime group.

21   Q.   And what do you do there?

22   A.   I investigate gangs.

23   Q.   Sir, are you familiar with an investigation of an

24   organization called PCM?

25   A.   I am.

1   Q.   What is PCM?

2   A.   Primeiro Comando da Massachusetts.

3   Q.   And who is -- what agencies are doing that investigation?

4   A.   HSI; Alcohol, Tobacco, Firearms and Explosives, and

5   multiple other law enforcement agencies.

6   Q.   Are you familiar with that investigation?

7           THE COURT:  Excuse me one minute.

8           MR. LAUER:  Your Honor, may I have a moment?

9           THE COURT:  Yes.  Mr. Costa -- sure.

10          MR. LAUER:  Can I just have the interpreter over with

11  me?

12          (Defendant conferring with counsel.)

13          MR. LAUER:  I'm sorry.  We can continue.

14          THE COURT:  Okay.  Thank you very much.

15  BY MR. MORAN:

16  Q.   I think you just testified you're familiar with that

17  investigation, correct?

18  A.   Yes.

19  Q.   Were you assigned that investigation?

20  A.   I've assisted with the investigation.

21          THE COURT:  I'm sorry?

22          THE WITNESS:  I've assisted with the investigation,

23  Your Honor.

24  Q.   What particular investigative techniques, if any, did this

25  investigation feature?

1    A.    This investigation featured undercover purchases of

2    firearms and drugs by use of cooperating witnesses.

3    Q.    Whose cooperating witnesses were they?

4    A.    Alcohol, Tobacco, Firearms and Explosives.

5    Q.    So did you specifically supervise the cooperating

6    witnesses?

7    A.    I did not.

8    Q.    What did the investigators -- let me withdraw that.

9          How did the investigators do the controlled purchases

10   involving the cooperating witnesses?

11   A.    They would have the cooperating witnesses meet him at a

12   special initial location, provide the vehicle with recording

13   devices in the vehicle.  They would search the cooperating

14   witnesses --

15          THE COURT:  Can you speak a little more slowly for the

16   interpreter so she can interpret everything you're saying.

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Thank you.

19          INTERPRETER:  Thank you, Your Honor.

20   A.    They'd meet at a location.  They would have a vehicle with

21   a recording device in the vehicle at that location.  They would

22   search the cooperating witnesses to make sure there was no

23   contraband on the cooperating witnesses.  Secondary, check out

24   the vehicle to make sure there's no contraband in the vehicle.

25   They would go to the meet location, meet with the people

1   providing the firearms or drugs and record -- they would record

2   those transactions.  They would also do surveillance on that

3   location.

4       When the meet was done, they would follow that vehicle

5   back to another location where they would search the -- they

6   would take possession of the contraband that was purchased.

7   They would search the confidential witnesses again and make

8   sure there's no additional contraband or anything else, and

9   they would let them go about their way.

10  Q.   Why did investigators take all those steps for the

11  controlled purchases for -- the cooperating witnesses?

12  A.   It's to maintain the veracity of the cooperating witnesses

13  but also the evidence.

14  Q.   Okay.  Were those procedures followed for the controlled

15  buys in this case?

16  A.   Yes, they were.

17  Q.   Were there any issues with those procedures?

18  A.   There was one.

19  Q.   What was that?

20  A.   In one -- one situation a camera stopped working.

21          THE COURT:  I'm sorry.  In one situation?

22  A.   In one incident throughout the investigation the recording

23  devices didn't properly work.

24  Q.   Aside from equipment malfunctions, were there any other

25  issues with the cooperating witnesses in terms of the

1   controlled buys?

2   A.   No.

3   Q.   Are you familiar the defendants, Marcio Costa -- are you

4   familiar with that defendant?

5   A.   Yes.

6   Q.   And how about Joao Pedro Marques Guimares Gama?

7   A.   Yes, I am.

8   Q.   By what name do you know Gama?

9   A.   By the last name, Gama.

10  Q.   And does he have a nickname, Bahianinho?

11  A.   Yes.

12  Q.   Were there controlled buys from those two men?

13  A.   Yes.

14  Q.   How did the cooperating witnesses first encounter Costa

15  and Gama?

16  A.   Through the investigation of undercover firearms

17  purchases, it became aware of those individuals.

18  Q.   Okay.  I want to turn your attention to November 28, 2018.

19  What happened that day?

20  A.   A controlled undercover purchase of a firearm.

21  Q.   From who?

22  A.   From Gama.

23       MS. JERUCHIM  Your Honor, I'm sorry.  I'm having

24  trouble hearing the witness.

25       THE COURT:  You just speak so fast.  Can you just push

1    the microphone up a little closer and just try to speak a

2    little bit slower, please.  Thank you.

3              THE WITNESS:  Okay.  Sorry, Your Honor.

4              MR. MORAN:  It's easier to pull the mic closer to you

5    than to lean forward.  If you lean forward, you'll lean back.

6              THE COURT:  Okay.

7    BY MR. MORAN:

8    Q.   You just testified that there was a controlled purchase on

9    November 28, 2018 of a pistol from Gama; is that correct?

10   A.   Yes.

11   Q.   Had the cooperating witnesses made any controlled

12   purchases from Gama or Costa before that day?

13   A.   No, they did not.

14   Q.   So that was the first day they encountered Costa and Gama?

15   A.   Yes.

16   Q.   And you said the controlled purchase of the pistol was

17   from Gama?

18   A.   Yes.

19   Q.   What happened after the controlled buy, if anything?

20   A.   The local police department made a motor vehicle stop of

21   the vehicle that they were operating.  Costa was identified by

22   his Massachusetts driver's license.

23   Q.   Was that license in his own name?

24   A.   Yes.

25   Q.   Did the local police get a name for Gama?

1   A.   They did get a name.

2   Q.   Was that his real name?

3   A.   No.

4   Q.   So as of November 28, 2018, had investigators identified

5   Gama?

6   A.   Not to that point.

7   Q.   Did they later identify him?

8   A.   Yes, they did.

9   Q.   How was that?

10  A.   They did it through Department of Homeland Security and

11  Department of State databases.

12  Q.   And what did they learn?

13  A.   They determined that he was a B2 overstay in the United

14  States.

15  Q.   So they learned both his name and his immigration status?

16  A.   Yes.

17  Q.   And as of November 28, 2018, what was his immigration

18  status?

19  A.   He was a B2 visa visitor for pleasure overstay, making him

20  illegally present in the United States.

21  Q.   And the firearm that was purchased on that day, was that

22  manufactured in Massachusetts?

23  A.   No, it was not.

24  Q.   Next I want to turn to what's been marked as Exhibit 1.

25  Do you see the exhibits in front of you?

1   A.   I do.

2   Q.   Do you see Exhibit 1?

3   A.   Yes.

4   Q.   What is that?

5   A.   That is a picture of Gama with a firearm.

6   Q.   What's the date of that picture?

7   A.   December 28, 2018.

8   Q.   What happened on December 28, 2018?

9   A.   A controlled undercover purchase of a firearm.

10  Q.   And that's from Gama?

11  A.   Yes.

12  Q.   And where did this still shot -- where did this photograph

13  come from?

14  A.   Come from the surveillance equipment in the vehicle.

15          MR. MORAN:  Your Honor, I offer Exhibit 1 into

16  evidence.

17          THE COURT:  Any objection?

18          MR. LAUER:  No.

19          MS. JERUCHIM:  No objection, Your Honor.

20          THE COURT:  Okay.  It's entered into evidence.

21          (Exhibit 1 admitted into evidence.)

22  BY MR. MORAN:

23  Q.   Are you aware of whether the pistol in Mr. Gama's hand was

24  manufactured in Massachusetts?

25  A.   No, it was not.

1          MR. MORAN:  There is no Exhibit 2 for the record.

2    Q.   Turning to what's been marked as Exhibits 3A and 3B, do

3    you see those?

4    A.   I do.

5    Q.   Turning to Exhibit 3B first, what is that?

6    A.   It's a picture of Gama with a box in his lap.

7    Q.   Okay.  And where is this picture from?

8    A.   Surveillance, the vehicle surveillance cameras.

9    Q.   Is that the same -- is that true also of Exhibit 3B?

10   A.   3 and 3B.

11   Q.   Is that from March 4, 2019?

12   A.   It is.

13   Q.   What happened on March 4, 2019?

14   A.   Controlled undercover purchase.

15   Q.   From whom?

16          THE COURT:  I'm sorry?

17          THE WITNESS:  Controlled undercover purchase, Your

18   Honor.

19   Q.   From whom?

20   A.   From Gama.

21   Q.   And if you turn to Exhibit 3A, what's going on in that

22   picture?

23   A.   There's a box containing two firearms.

24   Q.   Is the box now open?

25   A.   Yes.

1   Q.   And now -- it's got two firearms in it, you just said?

2   A.   Yes.

3   Q.   Do you know whether either of those firearms were

4   manufactured in Massachusetts?

5   A.   Neither of the firearms were manufactured in

6   Massachusetts.

7   Q.   And what is the other item in that box in Exhibit 3A?

8   A.   A bag containing cocaine base.

9   Q.   Do you know how much cocaine base?

10  A.   Approximately over 40 grams of cocaine.

11  Q.   Okay.  And is the drug cert back on those drugs?

12  A.   Yes, there are.

13  Q.   And it's certified that they were cocaine base?

14  A.   Yes.

15          MR. MORAN:  Your Honor, I offer Exhibits 3A and 3B.

16          THE COURT:  Any objection?

17          MR. LAUER:  No, Your Honor.

18          MS. JERUCHIM:  No, Your Honor.

19          THE COURT:  Okay.  They're admitted.

20          (Exhibits 3A and 3B admitted into evidence.)

21  BY MR. MORAN:

22  Q.   Now turning to Exhibit 4A and 4B, what are those?

23  A.   There's a picture of Costa.  4A is a picture of Costa with

24  what was later to be determined to be a Mauser firearm wrapped

25  in a plastic bag.

1    Q.    And what's in 4B?

2    A.    4B is a picture of Costa with the money that was exchanged

3    as part of selling that firearm.

4    Q.    Where do Exhibits 4A and 4B come from?

5    A.    Come from the surveillance on the video -- the video in

6    the vehicle, excuse me.

7    Q.    And that's from a controlled buy on March 18, 2019?

8    A.    Yes, it is.

9             MR. MORAN:   Your Honor, I offer Exhibits 4A and 4B.

10            THE COURT:   Okay.

11            MR. LAUER:   No objection.

12            THE COURT:   So admitted.

13            (Exhibits 4A and 4B admitted into evidence.)

14   BY MR. MORAN:

15   Q.    Now turning to Exhibit 4A, it looks like there's something

16   white in his hands.  What is that?

17   A.    That's a firearm wrapped in a plastic bag.

18   Q.    And it was later determined to be a Mauser, you said?

19   A.    Yes.

20   Q.    And was the Mauser manufactured in Massachusetts?

21   A.    No, it was not.

22   Q.    Now, in Exhibit 4B, what's happening there?

23   A.    That is the -- Costa has the money that was in his hands

24   that was exchanged for the firearm.

25   Q.    Now, this is dated March 18, 2019, correct?

1   A.   That's correct.

2   Q.   Was there another controlled buy on March 19, 2019?

3   A.   There was.

4   Q.   When was that set up?

5   A.   It was set up in the March 18 meeting.

6   Q.   Okay.  What was the controlled buy on March 19?

7   A.   Of -- actually, I just need to refresh my memory on that.

8   Q.   Sure.  Let me ask you a different question.  Who was the

9   controlled buy on March 19 from?

10  A.   From Costa.

11  Q.   And then I just asked you what the controlled buy was, and

12  you said -- would looking at the complaint refresh your

13  recollection?

14  A.   It would.

15          MR. MORAN:  Your Honor, if I may approach?

16          THE COURT:  Yes, you may.

17  Q.   Agent, I'm going to show you paragraph 29 on page 15 of

18  the criminal complaint.  Would you review that and look up when

19  you're done?

20  A.   Yes, sir.  (Witness reviews document)  I'm good, sir.

21  Q.   Does that refresh your recollection?

22  A.   It does.

23          MR. MORAN:  I'm retrieving the complaint.

24  Q.   What did the -- what did the cooperating witness purchase

25  on March 19, 2019 from Costa?

1    A.    Approximately 60 grams of crack cocaine.

2    Q.    And is the drug cert back on that, as far as you know?

3    A.    I believe it is.

4    Q.    Were there other controlled buys of guns and drugs from

5    Costa and Gama other than the ones we've just talked about?

6    A.    Yes, there was.

7    Q.    But we're not going to put in any evidence of those this

8    morning, correct?

9    A.    Yes.

10          MR. MORAN:  Your Honor, may I approach the computer?

11   I am going to, with your permission, play some other exhibits.

12          THE COURT:  Yes, you may.

13   Q.    Agent, were there other -- were there other investigative

14   techniques used in this investigation?

15   A.    Yes, there were.

16   Q.    What specifically?

17   A.    Other than what was already spoken about, an undercover

18   agent was brought into the case by -- through the cooperating

19   witnesses.

20   Q.    There was an undercover agent from what agency?

21   A.    ATF.

22   Q.    You just said -- who introduced the undercover agent to

23   the defendants?

24   A.    Cooperating witness.

25   Q.    For what purpose?

1    A.    To set up a potential armed robbery.

2    Q.    An armed robbery of what?

3    A.    Of drugs.

4    Q.    Who did the undercover agent say that he was?

5    A.    The undercover agent said that he was a drug courier

6    working for a Mexican drug trafficking organization.

7    Q.    And what did the undercover agent propose to rob?

8    A.    The undercover agent proposed to rob a stash house

9    containing approximately ten kilos of cocaine.

10   Q.    Did the undercover agent say whether the stash house would

11   be guarded?

12   A.    He did.

13   Q.    And by what, or whom?

14   A.    He stated that there would be multiple, one to more people

15   protecting the stash house with firearms.

16   Q.    Whose idea was it in the first place to do the robbery?

17   A.    Originally Gama had requested information from cooperating

18   witnesses.

19   Q.    About a robbery?

20   A.    About a potential robbery.

21   Q.    Now turning your attention -- if I may approach, Your

22   Honor?

23             THE COURT:  Yes.

24             MR. MORAN:  These should have been included in the

25   stack of exhibits.

1    Q.    I'll draw your attention to Exhibit 5.  What is that?

2    A.    Undercover meeting excerpt from March 20, 2019.

3    Q.    What happened on March 20, 2019?

4    A.    It was March 20, 2019.

5    Q.    Yeah.  What happened on that date?

6    A.    Undercover meeting between the undercover agent and Gama.

7    Q.    Was anyone else present for that?

8    A.    There was another person present.

9    Q.    Do you know who that was?  Do you remember who that was?

10   A.    No.

11   Q.    Where did that meeting take place?

12   A.    At a hotel.

13   Q.    Was it recorded?

14   A.    Yes.

15   Q.    What's actually on the disk?

16   A.    A brief recording of the conversation.

17   Q.    Is this excerpt on the disk an accurate excerpt of the

18   longer recording of the undercover?

19   A.    Yes.

20   Q.    And it's between the undercover and Gama, correct?

21   A.    The undercover and Gama who is listed as Bahianinho on

22   this, which is a name he's known by.

23   Q.    Okay.  And you mentioned "this."  That's Exhibit 5T?

24   A.    Yes.

25   Q.    Is 5T an accurate, although rough draft, of the excerpt?

```
 1   A.    Yes.
 2              MR. MORAN:  Your Honor, I'd offer Exhibit 5 and 5T.
 3              THE COURT:  Okay.  Any objection?
 4              MR. LAUER:  No, Your Honor --
 5              THE COURT:  So the --
 6              MR. LAUER:  -- obviously the recording speaks for
 7   itself.
 8              THE COURT:  Sure.
 9              (Exhibits 5 and 5T admitted into evidence.)
10              MR. MORAN:  With Your Honor's permission, may I play
11   the recording?  It's very brief.
12              THE COURT:  Yes.
13              (Recording played.)
14   Q.    To your knowledge what is Primeiro Comando da
15   Massachusetts?
16   A.    It's a criminal gang in Massachusetts.
17   Q.    And do you know who the leader is in Massachusetts?
18   A.    The leader is believed to be Costa.
19   Q.    And how about Mr. Gama; does he have a role in that
20   organization?
21   A.    Yes, he's believed to be also a leader in the
22   organization.
23   Q.    Okay.  Is he above or below Costa?
24   A.    He's below Costa.
25   Q.    Do you see Exhibit 6 in front of you?
```

1    A.    I do.

2    Q.    Sorry.  6A.

3    A.    Yes, sir.

4    Q.    What is 6A?

5    A.    6A is a Snapchat video of Gama's Snapchat.

6    Q.    How did the investigators come to acquire a Snapchat video

7    of Gama?

8    A.    They acquired it through way of the cooperating witness.

9    Q.    So the cooperating witness showed it to them?

10   A.    Yes.

11   Q.    And it's Gama on the video?

12   A.    Yes.

13   Q.    And turning to Exhibit 6B, what is 6B?

14   A.    6B on this page is a picture of Gama with a firearm in the

15   Snapchat video.

16   Q.    Is this a still shot of the Snapchat video that's on 6A?

17   A.    Yes.

18   Q.    And you can actual see in the video that it looks like

19   it's a recording of a cell phone?  Yes?

20   A.    Yes, it is.

21   Q.    Whose cell phone is being recorded?

22   A.    The cooperating witness.

23   Q.    And that's who brought up the Snapchat?

24   A.    Yes, sir.

25              MR. MORAN:  Your Honor, I offer Exhibits 6A and 6B.

1          THE COURT:  Okay.

2          MR. LAUER:  No objection.

3          THE COURT:  All right.  So admitted.

4          (Exhibits 6A and 6B admitted into evidence.)

5          MR. MORAN:  May I play 6 -- A?

6          THE COURT:  Yes.

7          MR. MORAN:  -- the computer?

8          (Recording played.)

9    Q.   So during that recording, what does Mr. Gama do with the

10   pistol?

11   A.   Racks the slide back multiple times.

12   Q.   And what does that do to a pistol?

13   A.   It will load a pistol or unload it if the magazine is not

14   in there.

15   Q.   When you put the magazine in and then rack it, what does

16   it do?

17   A.   You load the weapon.

18   Q.   Turning to Exhibit 6B, what do you see written at the top

19   of that -- or typed at the top of that image?

20   A.   It has the nickname Bahianinho, PCM.

21   Q.   Now turning to Exhibit 7, do you see that?

22   A.   I do.

23   Q.   What is that?

24   A.   This is a picture with the money on the ground that's

25   spelled out as PCM.

```
 1   Q.   What denomination of bills is used in that?

 2   A.   100-dollar bills.

 3   Q.   Where did that come from?

 4   A.   This came from Costa's social media.

 5   Q.   Okay.  How do the investigators have that?

 6   A.   They got it through way of the cooperating witness.

 7            MR. MORAN:  Your Honor, I offer Exhibit 7.

 8            MS. JERUCHIM:  No objection.

 9            MR. LAUER:  No objection.

10            THE COURT:  Okay.  So admitted.

11            (Exhibit 7 admitted into evidence.)

12   Q.   Finally, turn to Exhibit 8.  What is that?

13   A.   That's a picture of several males, including Gama and

14   Costa.

15   Q.   Which one is Costa?

16   A.   Costa is in the top middle, wearing the blue hat.

17   Q.   And which one is Gama?

18   A.   On the bottom left, wearing the red hat.

19   Q.   Now, are you --

20            MR. MORAN:  Your Honor, I offer Exhibit 8.

21            THE COURT:  Okay.  No objection?

22            MR. LAUER:  No objection.

23            THE COURT:  It's admitted.

24            (Exhibit 8 admitted into evidence.)

25   Q.   And agent, it appears that Mr. Gama and Mr. Costa both
```

1  have tattoos on the right hand on the outside of the hand.  Do

2  you have any information about what that means?

3  A.   As part of the investigation, they received information

4  that the tattoo signifies a large robbery that they had

5  committed.

6  Q.   And where did that information come from?

7  A.   Through the cooperating witnesses.

8  Q.   And you can see that they're all making the same gesture,

9  the men are making the same gesture with their hands, with

10  their right hands, involving three fingers out, kind of a

11  circle formed by the thumb and index finger; is that right?

12  A.   Yes, sir.

13  Q.   Do you know what that means?

14  A.   That's a suspected PCM gang hand sign.

15        MR. MORAN:  Your Honor, I have nothing further.

16        THE COURT:  Okay.  Thank you.  Mr. Lauer?

17        MR. LAUER:  Thank you.

18  CROSS-EXAMINATION BY MR. LAUER:

19  Q.   Good afternoon, sir.

20  A.   Good afternoon.

21  Q.   You testified that you assisted in this investigation; is

22  that correct?

23  A.   Yes, sir.

24  Q.   Can you elaborate on that?

25  A.   I have done --

1    Q.    What, specifically, was your role?

2    A.    My role was -- primarily it was other people in my

3    investigative group that were working with the ATF on this

4    case.  As any requests for assistance came in, mainly database

5    checks and stuff like that, I would assist.  I did not take

6    part in the operations.

7    Q.    You did not take part in the operations?

8    A.    I did not, sir.

9    Q.    So in terms of all of the controlled buys you've told us

10   about, you weren't there?

11   A.    I was not there, sir.

12   Q.    You don't have personal knowledge about what took place?

13   A.    No, sir.

14   Q.    And you testified you work for HSI, correct?

15   A.    Yes, sir.

16   Q.    The cooperating witnesses in this case, I think you

17   testified, came through the ATF; is that correct?

18   A.    Yes, sir.

19   Q.    Would it also be the case that you had no personal role in

20   dealing with the cooperating witnesses?

21   A.    I had no part in taking -- working with the cooperating

22   witnesses.

23   Q.    So you were not in the field in this case at all?

24   A.    I was not, sir.

25   Q.    How did you come to be here today?

1  A.    I was assigned to assist my group in testifying today.

2  Q.    In preparation for testifying today, did you review any

3  materials?

4  A.    Yes, I did, sir.

5  Q.    What did you review?

6  A.    I reviewed the affidavits, the affidavits in this case, I

7  believe there was the indictment, as well as researched the DHS

8  systems on these individuals, also reading reports of

9  investigation and observed recordings of -- these recordings

10  and some other information as well.

11  Q.    Okay.  What's the other information?

12  A.    That would be generally on the -- more of the case and

13  just --

14  Q.    Did you review ROIs or reports of investigation?

15  A.    I have reviewed ROIs.  I haven't reviewed every ROI.

16  Q.    In your role as an HSI agent, did you research Mr. Costa's

17  immigration status in the United States?

18  A.    I re -- I myself did not type them into the systems, but

19  in our -- I did review them --

20  Q.    And you're aware --

21  A.    -- HSI systems.

22  Q.    -- naturalized United States citizen?

23  A.    Yes, I am aware of that.

24  Q.    Fair to say a large part of this investigation occurred

25  through the cooperating witnesses, correct?

1    A.    I would believe so.

2    Q.    There were multiple controlled buys through the

3    cooperating witnesses?

4    A.    Yes, sir.

5    Q.    Cooperating witnesses were debriefed and provided

6    information?

7    A.    Yes, sir.

8    Q.    Cooperating witnesses provided certain postings of

9    photographs to social media?

10   A.    Yes, sir.

11   Q.    I believe you were asked on direct examination whether

12   there was any issues that arose in the controlled buys.  Do you

13   recall that question?

14   A.    Yes, sir.

15   Q.    You said there was one particular controlled buy in which

16   the camera malfunctioned.

17   A.    Throughout the whole case, sir.  I can't remember the

18   specific one right now.  But that did occur, yes.

19   Q.    Do you recall the date of that?

20   A.    Not right now.  I need to review.

21   Q.    Do you recall who was involved in that controlled buy that

22   you --

23   A.    I do not remember right now.

24   Q.    Aside from that technical issue having to do with the

25   recording, was there any other information brought to your

1    attention that was concerning regarding the cooperating

2    witnesses?

3    A.    No, sir.

4    Q.    You testified about an event on November 28, 2018.

5    A.    Yes.

6    Q.    That was a controlled purchase from both Mr. Gama and

7    Mr. Costa?

8    A.    Yes.

9    Q.    Who actually provided the contraband on that occasion?

10   A.    I believe it was Gama on that occasion.

11   Q.    I noticed that there's no exhibit that was offered by the

12   government from that particular event, a still photograph.  Was

13   that event recorded in any way?

14   A.    Yes, I believe it was.

15   Q.    Through a camera of the interior of the car similar to the

16   photographs we see on other controlled buys?

17   A.    I believe it was, sir.

18   Q.    Were agents surveilling the location where the controlled

19   buy took place?

20   A.    To my knowledge, they were, sir.

21   Q.    Were there photographs taken by the agents who were

22   conducting that surveillance?

23   A.    I do not know, sir.

24   Q.    And Exhibit 5, the government offered an excerpt of a

25   conversation occurring on March 20, 2019.  Do you recall that

1    exhibit?

2    A.    Yes, sir.

3    Q.    Have you reviewed the recording in its entirety?

4    A.    I have not.

5    Q.    How much of the recording have you reviewed?

6    A.    I have reviewed over what we heard today.

7    Q.    Nothing beyond the brief recording that is on this disk?

8    A.    I did not, sir.

9    Q.    If you look at Exhibit 5T, there is -- towards the bottom,

10   there's a -- it's listed here as a male saying (Spanish).  Do

11   you see that?

12   A.    Yes, sir.

13   Q.    Do you have any idea who that male was?

14   A.    I believe it was an unidentified male at this point.

15   Q.    You testified that Mr. Costa is believed to be the leader

16   of PCM.  Is that accurate?

17   A.    Yes, sir.

18   Q.    What is the basis for that conclusion?

19   A.    That is the finding of the overview of the investigation,

20   multiple incident --

21   Q.    What sources of information are there to support that?

22   A.    I actually don't know, sir.

23   Q.    So you are just essentially relying on what you heard?

24   A.    I'm relying on what's in the reports generated as part of

25   the investigation, findings of the investigative agents.

1    Q.    So you're relying on reports that you've read, right?

2    A.    Reports and conversations.

3    Q.    Okay.  And so when you testified a few moments ago that

4    Mr. Costa is believed to be the leader of PCM, what makes you

5    say that?

6    A.    The investigation has determined that he is the leader of

7    PCM Massachusetts.

8    Q.    Can you identify a single piece of specific evidence that

9    supports that as you sit here today?

10   A.    I have been -- unfortunately I'm going off of what I've

11   been told by the agents that are investigating the case.

12   Q.    So there's not one specific piece of evidence that you can

13   point to today to say, "We believe Mr. Costa is the leader of

14   PCM because . . ."?

15   A.    I believe there might be, inside of court documents that

16   might be stated.

17   Q.    And you reviewed those documents?

18   A.    I did, but there's other documents I reviewed in the last

19   -- short period.  I can't think of exactly where I would say

20   right now.

21   Q.    And of course you reviewed the reports generated by this

22   investigation, too?

23   A.    Not all of the reports, no.  But I reviewed reports, yes.

24   Q.    And despite reviewing those reports, despite reviewing the

25   affidavit in support of this complaint, you can't identify why

1   Mr. Costa is the leader?

2   A.   Unfortunately I cannot, sir.

3   Q.   The last exhibit is Exhibit 8.  This is a photograph that

4   appears to be taken from some sort of social media service; is

5   that correct?

6   A.   I actually don't know where that came from, sir.

7   Q.   You identified Mr. Costa as the person in the blue hat in

8   the back?

9   A.   Yes, sir.

10  Q.   And you identified Mr. Gama as the gentleman in the white

11  shirt in the front, to the left?

12  A.   With the red hat, yes.

13  Q.   With the red hat.  Who were the other individuals in this

14  photograph?

15  A.   I do not know personally, sir.  I know as part of the

16  investigation most of them, if not all, have been identified,

17  but I do not have that information.

18  Q.   Do you know where this came from?

19  A.   This came as part of the investigation.

20  Q.   No.  Before it became part of the investigation --

21  A.   No.  I think I said a minute ago I'm not sure where that

22  came from.

23  Q.   Do you know when this was taken?

24  A.   I do not, sir.

25          MR. LAUER:  No further questions.

1          THE COURT:  Okay.

2          MS. JERUCHIM:  Thank you.

3     CROSS-EXAMINATION BY MS. JERUCHIM:

4     Q.   Good afternoon, Special Agent Connolly.  My name is

5     Vivianne Jeruchim, and I represent Mr. Guimares Gama.

6          So following up on counsel for Mr. Costa, your role in

7     this investigation was essentially limited to searching

8     databases upon request; is that correct?

9     A.   Yes.

10    Q.   Okay.

11    A.   And assisting with this here today.

12    Q.   Okay.  So at no time were you ever out in the field

13    participating or -- "participating," meaning surveying any of

14    the controlled buys?

15    A.   No, I don't believe so.

16    Q.   All right.  So the controlled buys, at least for

17    discussion today, November 28, '18, March 18, 2019, March 19,

18    2019, March 20, 2019, you were not physically present at any of

19    those locations?

20    A.   No, ma'am.

21    Q.   And so you did not make a first-hand identification of the

22    individuals who reportedly made those transactions from the

23    motor vehicle; is that right?

24    A.   I did not.

25    Q.   And I believe you testified that when a motor vehicle stop

1   was performed -- in other words, a traffic stop was conducted

2   shortly after the stop, I believe it was on 11/28/18, that no

3   identification was provided to corroborate that the person who

4   was in the vehicle was Mr. Gama; is that correct?

5   A.   The information that I received is that a false name was

6   given.

7   Q.   So no information was provided that would have revealed --

8   that would have revealed a connection from the person sitting

9   in that vehicle to the name Gama; is that correct?

10  A.   (No response.)

11  Q.   Well, let me ask you in another way.

12  A.   Yeah, if you want to ask a different way.

13  Q.   So do you recall what form of identification, if any, was

14  provided by the individual who was sitting in the vehicle?

15  A.   The way I know it is that a false name was given.

16  Q.   Do you know if it was given through a form of

17  identification?  Was it given verbally?

18  A.   I do not know.

19  Q.   Okay.  But you would agree that the person who provided

20  that identification did not provide the name Gama or Guimares

21  Gama?

22  A.   That is what the investigation determined, yes.

23  Q.   Now -- and so in relying upon the exhibits that you

24  testified about, mainly Exhibit 1, Exhibit 3A, Exhibit 3B,

25  you're relying upon the conclusion by others in your unit that

1  the person depicted in those photographs is in fact the

2  individual who is sitting at the defense counsel table; is that

3  right?

4  A.   Yes, ma'am.

5  Q.   Okay.  Going to -- you testified that you believe or other

6  members of the team believed that the individual who is

7  depicted in the Exhibit 6B is in fact Mr. Guimares Gama; is

8  that right?

9  A.   Yes, ma'am.

10  Q.   All right.  So the photo revealed something purporting to

11  be a firearm in that individual's hand; is that correct?

12  A.   Yes, ma'am.

13  Q.   At no point did any members of the team, the investigative

14  team actually obtain this, what would be purportedly a firearm,

15  for testing to see whether or not it meets the definition of a

16  firearm?

17  A.   I do not know, ma'am.

18  Q.   Is there any report that you reviewed in preparation for

19  this case that would indicate that there was any confirmation

20  that the item in that individual's hand is actually a working

21  firearm?

22  A.   Not to my knowledge, ma'am.

23  Q.   So you understand also that there are, for example, air

24  soft firearms that could replicate or appear from an image or

25  even at a distance to look like a working firearm; is that

1  correct?

2  A.   Yes, ma'am.

3  Q.   And so there would be no way, for example, for you to make

4  a determination whether or not the item in the individual's

5  hand depicted in Government's Exhibit 6B is actually a working

6  firearm; is that correct?

7  A.   That's correct.

8  Q.   Now, one more time, going back to the photographs in

9  Exhibit 1, Exhibit 3A and 3B, you've testified that the items

10 that were retrieved -- that a firearm was retrieved from the

11 cooperating witness pursuant to those controlled buys?

12 A.   For which ones, ma'am?  1 and 3A?

13 Q.   1, 3A and 3B; is that right?

14 A.   Yes.

15 Q.   You're familiar with forensic evidence in the form of

16 latent prints, are you not?

17 A.   Generally familiar.

18 Q.   Okay.  To the best of your knowledge, were there any

19 latent prints that were taken and developed that would be a

20 match to Mr. Guimares Gama?

21 A.   I'm not sure of the status of that.  I'm not sure if that

22 was done; and if it was done, I'm not sure if the results have

23 come back.

24 Q.   All right.  So stated another way or questioned another

25 way, to your knowledge as you sit here, there are no definitive

1    results that would match latent prints, if any, taken from the

2    firearm to Mr. Guimares Gama?

3    A.    Not that I know of, ma'am.

4    Q.    Okay.  Now, you testified that there was in Exhibit --

5    turning your attention to Exhibit 8, there's a photograph

6    depicting five men in that photograph; is that right?

7    A.    Yes, ma'am.  Six men.

8    Q.    Oh, six men.  I'm sorry.

9    A.    Actually, I'm sorry.  You're right.

10   Q.    Five men, right?

11   A.    Five men.  Sorry.

12   Q.    Thank you.  And you testified that, according to the

13   information provided to you by others, you believe that the

14   individual in the lower left in the red hat is Mr. Guimares

15   Gama; is that right?

16   A.    Yes.

17   Q.    And again, that's based upon conclusions formed by others

18   that the person in that photograph is the person who is sitting

19   at defense counsel table?

20   A.    Yes, ma'am.

21   Q.    You also testified that other members of the team informed

22   you that the tattoo that is exhibited on at least two of the

23   individuals' hands that can be seen in this photograph, one of

24   whom is allegedly Mr. Guimares Gama, is a tattoo that

25   represents an armed robbery that was committed by members of

1    PCM?

2    A.    The way it was explained to me is that is a tattoo that

3    they would get to signify a robbery that they had committed.

4    Q.    And where -- where was this information obtained from?

5    A.    That was obtained as part of the investigation.

6    Q.    And from where?  Where specifically was that obtained?

7    A.    I can't remember off the top of my head.  I believe it

8    would be as part of the investigation.

9    Q.    Can you be more -- you prepared obviously for testimony in

10   this case.  That would include evidence about this tattoo; is

11   that right?

12   A.    Yes.  One of the areas I remember is an agent, as part of

13   a conference, explained that, but I don't remember the

14   specifics.  I can't think of a specific report right now that

15   that was documented.

16   Q.    So you cannot recall anything that would support your

17   testimony today representing that that tattoo had some

18   significance in the alleged commission by these individuals of

19   an armed robbery?

20   A.    I was told by the investigators that that was the case,

21   the investigators --

22   Q.    Anything else --

23   A.    -- who investigated the case.

24   Q.    -- to support that?

25   A.    Not my first-hand knowledge, no.

1          MS. JERUCHIM:  Okay.  I have no further questions.

2     Thank you.

3          THE COURT:  Okay.

4          MR. MORAN:  No redirect, Your Honor.

5          THE COURT:  Okay.  Thank you very much, sir.

6          THE WITNESS:  Thank you, Your Honor.

7          MR. MORAN:  No further evidence, Your Honor.

8          THE COURT:  Okay.  Arguments, Mr. Lauer?

9          MR. LAUER:  For the record, no evidence on behalf of

10    Marcio Costa.

11          MS. JERUCHIM:  And none on behalf Mr. Guimares Gama.

12          THE COURT:  Okay.

13          MR. LAUER:  I'll be brief.  The government certainly

14    is well within their rights to offer evidence in the form of

15    hearsay.  The court has to make a determination as to the

16    reliability of the evidence that it has heard.  Here, the

17    testimony that you've heard is clearly -- it raises the

18    concerns that occur in any form of hearsay, someone relaying

19    information they got from another source who got it from

20    another source.

21          The government could have elected to bring an officer

22    or agent who had direct knowledge of various facets of the

23    investigation and who could be responsive to questioning, and

24    they did not to that.  So understanding that the government is

25    within their rights to proceed via hearsay, I think the court

```
 1    has a responsibility to determine just how reliable it was.

 2              THE COURT:  Okay.  Thank you.  Yes, Ms. Jeruchim?

 3              MS. JERUCHIM:  Your Honor, I would echo my brother's

 4    statements, and I would also add to the court's again reliance

 5    on the accuracy of at least the photographs that we perceive

 6    that's been received as Exhibits 1 through 8.  And I would

 7    suggest that at least from my fair review of the photographs,

 8    there is certainly a lot of question as to whether or not it

 9    purports to be the individual, my client, who is sitting next

10    to me.

11              And so again, because this case is built upon hearsay

12    upon hearsay with essentially nothing reliably accurate before

13    the court to make that connection, I would suggest that

14    probable cause has not been established.  Thank you, Your

15    Honor.

16              THE COURT:  Okay.  So as everyone knows, the standard

17    for probable cause is very low.  It is simply whether there's

18    enough to charge someone.  It's not proof beyond a reasonable

19    doubt, which would have to be shown at trial.  If this were a

20    trial, obviously the government has not met its burden.  But at

21    this hearing, my job is just to determine is there enough

22    evidence to charge these men with the crimes that they've been

23    charged with, and I find that there is.

24              Hearsay is admissible.  You don't have to have the

25    primary witness present at a probable cause hearing.  So I'm
```

1    going find that there is probable cause, and I'm going to issue

2    the orders of voluntary detention.  And is there anything else

3    we need to do today?

4              MR. MORAN:  No.  Thank you, Your Honor.

5              THE COURT:  Okay.  Thank you very much.

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the digitally recorded proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this <u>18th day of May, 2019.</u>

/s/ Kelly Mortellite

_____

Kelly Mortellite, RMR, CRR

Official Court Reporter

